EMILY F. BRITTON, Appellant, *vs.* SARAH J. ESSON *et al.* Appellees.

*Opinion filed October 28, 1913—Rehearing denied Dec. 5, 1913.*

1. DEEDS—*when deed should not be set aside at grantor's instance.* A deed which is the voluntary act of the grantor, made entirely upon his own initiative, without the request, suggestion, influence or persuasion of any other person, and without even the previous knowledge of the grantee that the deed was to be made, cannot be set aside at the instance of the grantor merely because he is dissatisfied with the situation.

2. CONTRACTS—*when contract will be set aside as unfairly obtained.* A contract made by an old man ninety years of age, blind and in feeble health, by which he agreed to pay his daughter and her husband $200 a year for his support and at his death give his daughter promissory notes against her husband for $3156, will be set aside in equity, where it clearly appears the agreement was not what the old man desired to do but was what the daughter and her husband and a third party, who acted as a volunteer in adjusting the difficulties between the parties, desired him to do, there having been a demand by the old man to have the daughter surrender the notes, which he had given her to take care of, and a refusal by her, without right or justification, to surrender them until he entered into some agreement.

APPEAL from the Circuit Court of Kankakee county; the Hon. C. B. CAMPBELL, Judge, presiding.

LOUIS A. HEILE, and DYER & WHITTEMORE, for appellant.

260 — 18

GOWER, COOPER, HOBBIE & PARISH, for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

William Tate in his lifetime filed a bill against the appellees by which he sought to have set aside a conveyance of real estate which he had made to Sarah J. Esson and a written agreement in regard to personal property which he had made with her. He died during the pendency of the suit, leaving a will, which was admitted to probate, and the suit was revived in the name of the executrix of his will and the devisee and legatees under it. The bill was dismissed by the court, upon a hearing, for want of equity, and Emily F. Britton, who is the executrix as well as the residuary devisee and legatee, has appealed.

William Tate was born December 11, 1819. He died on February 2, 1912, having been for twenty years totally blind. He was married twice. The appellee Sarah J. Esson is his daughter, the only child of the second marriage. The appellant, Emily F. Britton, and her brother, George Tate, are the children of the first marriage. They live in Chicago. William Tate's home for many years before his death was in the village of Grant Park, in Kankakee county, where he owned the homestead in which he resided with his wife. His daughter and her husband, Samuel Esson, lived in the same village. Mrs. Tate died in August, 1907. At that time William Tate, besides the homestead, owned four promissory notes of Samuel Esson, amounting to $3150, bearing interest at five per cent, other promissory notes amounting to $2000, several hundred dollars in the bank, and the written obligation of Samuel Esson for $100 per annum, payable during Tate's life. These notes and other papers were in his possession and he kept them at his house. When Mrs. Tate was taken sick there was nobody to take care of her and her husband in their home, and a week before her death Mrs. Esson took both her father and mother to her own home, where they remained until Mrs.

Tate's death. Tate's house was thus left empty, and he directed Mrs. Esson, who knew where the papers were kept, to get them and take care of them for him. After Mrs. Tate's death he continued to live with the Essons under an agreement to pay them $200 a year, and this sum was paid by deduction from the interest they owed him. After his wife's death Tate was ill and had several "bad spells," as Mrs. Esson described them. After one of these, which occurred on October 12, 1907, six weeks after Mrs. Tate's death, he asked to have E. H. Buck, a notary public living in the country, called, and this was done. When he came, Tate told him that he wanted to deed his place to his daughter. The deed was prepared and executed and Buck took the acknowledgment and had the deed filed for record. A short time before May, 1910, Tate asked his daughter and her husband for their four notes for $3150, signed by Esson, which he had thus delivered to Mrs. Esson for safe keeping, but they refused to surrender them to him on the pretext that he had promised to give them the notes; that Mrs. Esson had done much more for her father than her half-brother and half-sister; that the latter would share in the proceeds of the notes if Esson had to pay them, and that it was not fair that they should do so. Tate consulted an attorney in Kankakee and caused a letter to be written to Esson and his wife demanding the surrender of the notes, but no attention was paid to it. Before consulting the attorney Tate had met on the street a neighbor, Jerome Clapsaddle, to whom he had spoken briefly about his trouble with the Essons. Now, after the attorney's demand proved unavailing, Tate again went to Clapsaddle and told him that he intended to leave the Essons. Clapsaddle dissuaded him from leaving at that time, advised him against litigation and finally arranged a meeting, at which were present Tate, the Essons, Clapsaddle and David Price. As a result of that interview Samuel Esson executed a new note to Tate for $3150, dated March

I, 1910, due five years after date and drawing five per cent interest. This note was delivered to Price and the following instruments were executed:

"This memoranda of agreement, made and entered into this 26th day of May, A. D. 1910, by and between Sarah J. Esson and William Tate, both of Grant Park, Illinois, witnesseth:

"That the said Sarah J. Esson agrees to take said William Tate into her home and carefully care for and provide for him all ordinary care and maintenance while he shall stay and make his home with her. And the said William Tate agrees to pay said Sarah J. Esson for such home, care and maintenance the sum of $200 per annum, to be paid as follows: $200 on the first (1) day of March of each and every year during the time he is being thus cared for, beginning with March 1, 1911. And as further compensation for such home and care, the said William Tate agrees to give to said Sarah J. Esson a certain promissory note now held in escrow by David Price, of Grant Park, Ill., said promissory note being for the sum of $3150, signed by Samuel Esson, bearing interest at five per cent per annum, said interest payable annually. Said note to be held by said David Price during the lifetime of said William Tate and at his death to be delivered to said Sarah J. Esson as her property, without any further instructions from said William Tate. And the said Sarah J. Esson also agrees to pay one-half of the necessary funeral expenses of said William Tate, provided his death takes place while he lives with her.

"Dated this 26th day of May, 1912.        his
                                WILLIAM X TATE,
                                            mark
Witness to mark, Jerome Clapsaddle.    SARAH J. ESSON."

"GRANT PARK, ILLINOIS, *May 26, 1910.*

"Received from William Tate one promissory note for the sum of $3150, said note being signed by Samuel Esson, Grant Park, Ill., and payable to said William Tate, dated March 1, 1910, and due in five years from date, with interest at five per cent per annum, interest payable annually. It is understood between said William Tate and David Price that said note is deposited in escrow, and is to be retained by said David Price during the lifetime of said William Tate and at his death to be delivered to Sarah J. Esson. Interest on said note to be collected annually, when due, by said David Price and by him paid to such parties as he, the said William Tate, shall direct. And also a certain obligation from Samuel Esson to William Tate whereby said Samuel Esson agrees to pay said William Tate the sum of $100 annually as long as said William Tate shall live.        DAVID PRICE."

Tate continued to live with the Essons but the situation was unpleasant. He testified that he was not noticed and was like a hermit in the house; that Esson and his wife either refused to converse with him or gave him short answers; that he could not learn what was going on about him; that if he was sitting in one room they would go into another, and that he could not hear a piece of common newspaper gossip. This condition of affairs continued until August, 1910, when Tate, having made up his mind that he was not wanted, left the Esson home and went to Chicago to reside with his daughter Mrs. Britton. In February, 1911, he filed the original bill herein to set aside both the deed of October 12, 1907, and the agreement of May 26, 1910, on the ground that they were unfair and inequitable and were obtained by undue influence and unfair advantage taken of the relation between the parties.

The evidence shows no reason for setting aside the deed. It was the voluntary act of the grantor, made entirely on his own initiative, without the request or suggestion of any other person and without the previous knowledge of the grantee. No influence or persuasion is even remotely suggested by the evidence, and the decree properly dismissed the bill so far as the deed is concerned.

The agreement stands on a different footing. The four notes against Samuel Esson were the unquestioned property of William Tate. The answer of Samuel Esson and Sarah J. Esson admits that they were given for loans of money and were payable and owing to Tate, and that he delivered them to Sarah J. Esson to be kept and preserved for him. A demand, made after more than two years, for their return was refused, without justification or legal excuse of any kind. It is true that the claim was made by the daughter that her father had promised to give the notes to her at his death and only to require the payment of interest during his life; but even if this were so, she had no right to keep the notes to compel the per-

formance of a promise which was not binding on him and which he was at liberty to observe or disregard, as he chose. For five or six months before the agreement was executed he was demanding the notes and his daughter was claiming that she was entitled to them. There was a good deal of controversy, and he was much wrought up about it and threatened to sue for the notes. The son-in-law told him that he would never get the notes until he made some agreement, since he had lied about giving the notes to his daughter. After the demand through an attorney failed to secure a return of the notes Clapsaddle arranged for the meeting at which the agreement was made. He was not acting as a representative of Tate but of his own volition, as an intermediary or common friend. He was not trying to secure the notes for Tate, as the latter desired, but thought it best that they should remain deposited with some other person. He thought it best for Tate to remain with the Essons and neither leave their home nor engage in litigation with them. He procured Price, of his own motion, to attend the meeting. No one at that meeting was representing Tate or looking after his pecuniary interest. The plan of the agreement was Clapsaddle's, Price was the scrivener, and the dominant idea of everybody but Tate was that it was for his interest to continue to live with his daughter, to avoid litigation about the notes and to have the notes in other hands than his own. In the negotiation which followed, if it should be called negotiation, it is not unnatural that the old man, past ninety years of age, in the darkness of total blindness, hard of hearing and feeble, standing alone, finally succumbed to the advice pressed upon him and yielded the whole controversy. He got nothing. He was then living with his daughter and son-in-law and paying them $200 a year, the amount specified in the agreement. He agreed to continue this payment and in addition to give them $3150 at his death. He surrendered the whole issue for which he had been con-

tending for months, and it is manifest that the power of his mind to resist was overcome by the weight of the opposition, and he finally consented to an agreement which represented the will of the other parties and not his own. Without regard to any question of fiduciary relationship, an unfair agreement obtained by taking advantage of such a situation ought not to be allowed to stand. The inequality of the parties in the negotiation, the injustice of the contract and the circumstances under which it was made indicate that the agreement did not have the intelligent assent of William Tate but was procured by the undue influence of his daughter and son-in-law and unfair advantage taken of him.

The decree of the circuit court will be affirmed as to the deed of October 12, 1907, but in all other respects it will be reversed and the cause will be remanded, with directions to enter a decree setting aside the contract of May 26, 1910; requiring the payment by Samuel Esson of $3150, with five per cent interest thereon from March 1, 1910, to Emily F. Britton, executrix of the last will and testament of William Tate, deceased, and authorizing execution therefor; requiring David Price to pay to Emily F. Britton, executrix of the last will and testament of William Tate, deceased, the sum of $100 paid by Samuel Esson on March 1, 1911, on the obligation for the payment of $100 annually to William Tate during his life, mentioned in the receipt of David Price hereinabove mentioned and authorizing execution therefor; also requiring David Price to deliver to Emily F. Britton, executrix as aforesaid, the said obligation of Samuel Esson for the payment of $100 annually to William Tate during his life.

*Reversed and remanded, with directions.*